## UNITED STATES COURT OF APPEALS FOR
## THE FIFTH CIRCUIT

| | | |
|---|---|---|
| CAMULET SHREVEPORT REFINING, L.L.P., *et al.*,<br><br>Petitioner,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY,<br><br>Respondent. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 22-60266 and consolidated cases |

## MOTION OF RENEWABLE FUELS PRODUCERS
## TO INTERVENE IN SUPPORT OF RESPONDENT
## U.S. ENVIRONMENTAL PROTECTION AGENCY

Pursuant to Federal Rule of Appellate Procedure 15(d) and Fifth Circuit Rule 15.5, the Renewable Fuels Association ("RFA"), Growth Energy, the American Coalition for Ethanol ("ACE"), the National Farmers Union ("NFU"), and the National Corn Growers Association ("NCGA") respectfully move for leave to intervene in support of Respondent United States Environmental Protection Agency ("EPA") in these consolidated cases seeking review of EPA's final actions entitled "June 2022 Denial of Petitions for Small Refinery Exemptions Under the Renewable Fuel Standard Program," published in the Federal Register at 87 Fed. Reg. 34,873

(June 8, 2022) ("June SRE Denial") and the "April 2022 Denial of Petitions for Small Refinery Exemptions Under the Renewable Fuel Standard Program," published in the Federal Register at 87 Fed. Reg. 24,3000 (April 25, 2022) ("April SRE Denial").

Respondent EPA does not oppose the relief sought in this motion. Petitioners oppose the relief.

## BACKGROUND

"Congress enacted [the Renewable Fuel Standard ('RFS')] in order 'to move the United States toward greater energy independence and security' and 'increase the production of clean renewable fuels.'" *Ams. for Clean Energy v. EPA*, 864 F.3d 691, 697 (D.C. Cir. 2017) (quoting Pub. L. No. 110-140, §§201-202, 121 Stat. 1492 (2007)). To this end, the RFS "requires" that obligated parties—refiners and importers of gasoline and diesel—introduce "increasing volumes of renewable fuel" into the gasoline and diesel they produce. *Id.* EPA "establish[ed] a 'credit program' through which obligated parties can acquire and trade credits and thereby comply with" their volume obligations. *Id.* at 699. These credits—called Renewable Identification Numbers ("RINs")—are generated when renewable fuel is produced and then acquired by obligated parties when they acquire the renewable fuel. *Id.* The RINs are then "separated" from the renewable fuel once they are blended with fossil fuel to make transportation fuel—at which point they may be traded in an open market. *Id.* Finally,

the RINs are "retired" when used by an obligated party to show compliance with its RFS obligations. *Id.*

As relevant here, Congress allowed individual "small refineries" to petition EPA for an "exemption" from their RFS obligations for a given year "for the reason of disproportionate economic hardship." 42 U.S.C. § 7545(o)(9)(B)(i); *see* § 7545(o)(1)(K) (defining "small refinery"). These compliance exemptions are known as "small refinery exemptions" ("SREs").

On August 9, 2019, EPA granted 31 SRE petitions for the 2018 compliance year. A group of biofuels interest groups, including movants here, filed a petition for review in the D.C. Circuit challenging EPA's decision. *See* Petition for Review, *Renewable Fuel Ass'n v. EPA*, Case No. 19-1220 (D.C. Cir. Filed Oct 22, 2019), ECF #1812533. While that challenge was pending, the Tenth Circuit issued a decision holding that, in granting some prior SRE petitions, EPA had failed to comply with statutory requirements and also failed to appropriately account for its longstanding position that all refineries recover the cost of RFS compliance in the price of their products. *See Renewable Fuels Association v. EPA*, 948 F.3d 1206 (10th Cir. 2020), *rev'd in irrelevant part sub nom. HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172 (2021) ("*RFA*"). One of the Tenth Circuit's holdings regarding eligibility requirements for SREs was appealed to the Supreme Court. *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172

(2021). The D.C. Circuit case regarding the 2018 SRE petitions was held in abeyance pending the Supreme Court's decision. *See Renewable Fuel Ass'n v. EPA*, Case No. 19-1220, ECF #1885774. After the Supreme Court decided *HollyFrontier*, EPA filed a motion requesting that the D.C. Circuit remand the decision granting the 2018 SRE petitions to EPA without vacatur, which the court granted on December 8, 2021. *See id.*, ECF #1911608, #1925942. EPA then denied 36 SRE petitions for the 2018 compliance year, including the 31 that had previously been granted in 2019, based a revised approach to evaluating SRE petitions—the April SRE Denial.[1] Applying the same new approach, on June 3, 2022, EPA denied 69 small refinery exemption petitions for compliance years 2016-2021—the June SRE Denial.[2]

EPA adopted this revised approach in response to the Tenth Circuit's decision invalidating EPA's prior interpretation of the relevant statutory provision and determining that EPA had unlawfully disregarded certain essential facts regarding the cost of RFS compliance. *See RFA*, 948 F.3d 1206. Thus, in its April and June SRE Denials, EPA first interpreted the statute to require that the small refinery's disproportionate hardship be *caused by* its RFS compliance obligation. 87 Fed. Reg. at 34,874. EPA found empirically that all obligated parties, including small refineries,

---

[1] EPA, April SRE Denial of Petitions for RFS Small Refinery Exemptions, https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1014EG4.pdf.

[2] EPA, June 2022 Denial of Petitions for RFS Small Refinery Exemptions, https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P10156DA.pdf.

face the same proportional costs to comply with the RFS (in large part because all obligated parties pass their RIN costs down the supply chain). *Id.* Consequently, EPA found, "there is no disproportionate cost to any party, including small refineries, and no hardship given that the costs are recovered," caused by RFS compliance. *Id.* EPA therefore concluded that Petitioner did not satisfy the statutory requirements for an SRE. *See id.*

On May 4, 2022, Sinclair Wyoming Refining Company LLC and Sinclair Casper Refining Company LLC filed a petition for review in the D.C. Circuit challenging the April SRE Denial. *See Sinclair Wyo. Refining Co. LLC v. EPA*, Case No. 22-1073 (D.C. Cir. filed May 4, 2022). That case was subsequently consolidated with 39 other cases challenging the April SRE Denial or the June SRE Denial. *See id.* at ECF #1955109, #1955904, #1958789, #1960472, #1973398. Movants timely filed motions to intervene in those consolidated cases. *See id.* at ECF #1971716, #1974619.

On May 3, 2022, Calumet Shreveport Refining filed the petition for review in this case challenging the April SRE Denial. Dkt. 1. On June 22, 2022, EPA filed a motion to dismiss the petition for lack of jurisdiction and to transfer the case to the D.C. Circuit. Dkt. 31. On August 26, 2022, this Court denied EPA's motion to dismiss but granted EPA's motion to transfer the case to the D.C. Circuit. Dkt. 95. The petitioners moved for reconsideration of the Court's order on September 20, 2022. Dkt. 100. This Court granted petitioners' motion for reconsideration and ordered that

EPA's motions to transfer and to dismiss be carried with the case. Dkt. 120. On

September 22, 2022, EPA filed a motion to stay further proceedings in this case

pending resolution of the consolidated challenges to the same EPA decisions in the

D.C. Circuit. Dkt. 124. This Court denied EPA's motion on November 29, 2022. Dkt.

146. On January 4, 2023, this Court consolidated this case with several other cases

challenging EPA's April SRE Denial and June SRE Denial. Dkt. 164.

## ARGUMENT

RFA, Growth Energy, ACE, NFU, and NCGA seek to intervene in this case to

protect their substantial interests in EPA's implementation of the RFS program,

including ensuring that the renewable fuel standards are not unlawfully reduced by

SREs. The U.S. Courts of Appeals for the District of Columbia Circuit and the Tenth

Circuit have consistently confirmed that, as representatives of producers of renewable

fuels and their feedstocks, RFA, Growth Energy, ACE, NFU, and NCGA meet the

standard for bringing challenges against and intervening to defend EPA's actions

related to the RFS, including SRE-related actions. *See, e.g.*, *Renewable Fuels Ass'n*,

948 F.3d at 1231-39; Order, *Am. Fuel & Petrochemical Mfrs. v. EPA*, No. 19-1124,

ECF # 1799049 (D.C. Cir. 2021); Order, *RFS Power Coalition v. EPA*, No. 20-1046,

ECF #1843937 (D.C. Cir. May 22, 2020); Order, *Growth Energy v. EPA*, No. 19-

1023, ECF #1784196 (D.C. Cir. Apr. 23, 2019); Order, *Am. Fuel & Petrochem. Mfrs.

v. EPA*, No. 17-1258, ECF #1725309 (D.C. Cir. Apr. 5, 2018); Order, *Alon Refin.*

*Krotz Springs, Inc. v. EPA*, No. 16-1052, ECF #1722824 (D.C. Cir. Mar. 19, 2018);

Order, *Coffeyville Res. Refin. & Mktg v. EPA*, No. 17-1044, ECF #1706266 (D.C. Cir.

Nov. 28, 2017); Order, *Ams. for Clean Energy v. EPA*, No. 16-1005, ECF #1611965

(D.C. Cir. May 5, 2016); Order, *Monroe Energy, LLC v. EPA*, No. 13-1265, ECF

#1468501 (D.C. Cir. Dec. 2, 2013).

## I.  <u>Movants Are Entitled to Intervene</u>

Federal Rule of Appellate Procedure 15(d) permits a party to intervene in a

proceeding to review agency action if a motion to intervene is timely and "contain[s] a

concise statement of the interests of the moving party and the grounds for

intervention." Fed. R. App. P. 15(d). This Court's rules establish the standard for

timeliness: "A motion to intervene under Fed. R. App. P. 15(d) should be filed

promptly after the petition for review of the agency proceeding is filed, but not later

than 14 days prior to the due date of the brief of the party supported by the

Intervenor." 5th Cir. R. 15.5 (Time for Filing Motions for Intervention). Substantively,

this Court generally looks to the same standards as in the district court in deciding

whether intervention is warranted. *See Automobile Workers v. Scofield*, 382 U.S. 205,

216-17 & n. 10 (1965); *Richardson v. Flores*, 979 F.3d 1102, 1105 (5th Cir. 2020).

Consequently, a party has a right to intervene if it "claims an interest relating to the …

transaction that is the subject of the action, and is so situated that disposing of the

action may as a practical matter impair or impede the movant's ability to protect its

interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2).

This Court uses a four-factor test to determine whether a party meets the requirements to intervene by right: (1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the existing parties to the suit. *Guenther v. BP Retirement Accumulation Plan*, 50 F.4th 536, 542 (5th Cir. 2022). RFA, Growth Energy, ACE, NFU, and NCGA satisfy this test.[3]

### A. This Motion Is Timely

As noted, this Court's Rule 15.5 specifies that a motion to intervene be filed "promptly after the petition for review" and "not later than 14 days prior to the due date of the brief of the party supported by the Intervenor." 5th Cir. R. 15.5. Although the petitions for review were filed some months ago, this motion is being filed reasonably promptly given the history of this case, and importantly is being filed far more than 14 days before the supported party brief—EPA's response brief—is due.

---

[3] RFA, Growth Energy, ACE, NFU, and NCGA also satisfy the standard for permissive intervention because (for similar reasons) they have a "defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b).

Indeed, *petitioners'* brief is not due until March 2, 2023. *See* Dkt. 195.

In both the April SRE Denial and June SRE Denial, EPA provided that "[u]nder section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals *for the District of Columbia Circuit*." April SRE Denial at 72 (emphasis added); June SRE Denial at 73 (emphasis added). Movants thus reasonably concluded that the D.C. Circuit had exclusive jurisdiction over challenges to the April SRE Denial and June SRE Denial, and accordingly, filed timely motions to intervene in the consolidated D.C. Circuit cases. *See Sinclair Wyoming Refining Company LLC*, No. 22-1073, ECF #1971716, #1974619. This Court confirmed that understanding when it granted EPA's motion to transfer this case to the D.C. Circuit. Dkt. 95-3.

Movants thus had no need to participate in this case to defend the merits of the SRE Denials until much more recently—after this Court reconsidered its order granting EPA's motion to transfer and ordered that the motion to dismiss for lack of jurisdiction be carried with the case and denied EPA's ensuing motion to stay the proceedings pending resolution of the D.C. Circuit case on November 29, 2022. Dkt. 120, 146. Movants' request now comes within a reasonable amount of time after resolution of these issues.

Importantly, the timing of this motion will not prejudice any parties, and particularly the opposing petitioners, because again, they have not even filed their opening brief yet.

This Court "is empowered for good cause shown to enlarge the time limits prescribed by the Federal Rules of Appellate Procedure." *Nelson v. James*, 722 F.2d 207, 208 (5th. Cir 1984) (internal quotation marks omitted); *see also Ala. Power Co. v. Interstate Commerce Comm'n*, 852 F.2d 1361, 1374 (D.C. Cir. 1988) (Robinson, J. concurring) (citing Fed. R. App. P. 26(b)) ("[W]hile motions for leave to intervene ordinarily must be filed within 30 days after filing of the petition for review," this Court "ha[s] full authority to enlarge the time for intervention when good cause therefore has been shown."). Here, good cause exists for all the reasons just stated. Moreover, if not provided the opportunity to intervene, movants could be deprived of the ability to protect their substantial interest in EPA's implementation of the RFS program, as described in detail below. This case likely will be resolved before the same issues are addressed by the D.C. Circuit. If that happens, movants might be unable to sufficiently protect their interests if they are permitted to intervene only in the D.C. Circuit action.

### B. RFA, Growth Energy, ACE, NFU, and NCGA Have a Strong Interest in This Case

RFA, Growth Energy, ACE, NFU, and NCGA are leading trade associations dedicated to promoting the commercial production and use of the most widely used

renewable fuel, ethanol. Emily Skor ("Skor Decl.") ¶ 9 (attached). Their memberships include producers of renewable fuel and its feedstock (mainly corn), as well as associated supporters of the renewable fuel industry. *See* Geoff Cooper ("Cooper Decl.") ¶ 9 (attached); Skor Decl. ¶2 ; Brian Jennings ("Jennings Decl.") ¶¶ 4-5 (attached); Rob Larew ("Larew Decl.") ¶4 (attached); RFA, *RFA Members*, https://ethanolrfa.org/about/rfa-members (last visited Feb. 2, 2023); Growth Energy, *Our Members*, https://growthenergy.org/members (last visited Feb. 2, 2023); ACE, *Member Directory,* https://ethanol.org/people/member-directory (last visited Feb. 2, 2023); NFU, *Membership,* https://nfu.org/join/ (last visited Feb. 2, 2023); NCGA, *Mission & Vision*, https://www.ncga.com/about-ncga/who-we-are/mission-and-vision (last visited Feb. 2, 2023).

The RFS volume requirements define the national "demand" for renewable fuel, *i.e.*, for movants' members' products. *Ams. for Clean Energy*, 864 F.3d at 705; *Monroe Energy, LLC v. EPA*, 750 F.3d 909, 917 (D.C. Cir. 2014). By relieving certain obligated parties of their RFS obligations, however, SREs depress the demand for those products, "creat[ing]" a "renewable-fuel shortfall." *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 568, 571 (D.C. Cir. 2019); Cooper Decl. ¶¶ 12, 15; Skor Decl. ¶¶ 15-16. This occurs even when EPA grants an SRE petition after the compliance deadline (which would be the case with respect to many of the SREs at issue here if they were to now be granted, as Petitioner wants). EPA would return

RINs to the exempt refineries, reflecting their newly exempt volumes, *see, e.g.*, *Producers of Renewables United for Truth & Transparency v. EPA*, 778 Fed. App'x 1, 3 (D.C. Cir. 2019), which could be used to meet future RFS obligations in place of physical volumes of renewable fuel, thereby suppressing the use of renewable fuel in that future year. Cooper Decl. ¶¶ 12, 16; Skor Decl. ¶ 16; Jennings Decl. ¶ 13.

Accordingly, participation in this litigation is essential for RFA, Growth Energy, ACE, NFU, and NCGA to protect the interests of their respective members. Vacatur of the April and June SRE Denials would disrupt the renewable fuel market, adversely impacting the businesses and investments that RFA's, Growth Energy's, ACE's, NFU's, and NCGA's members have made in the biorefineries, feedstocks, and technologies used to produce renewable fuel.

Because of the effect that SREs have on movants' members' business, RFA, Growth Energy, ACE, NFU, and NCGA actively participated in the public comment process to express support for EPA denying the SREs, submitting comments in response to EPA's notice of proposed denial of SREs.[4] Additionally, RFA, Growth Energy, ACE, NFU, and NCGA have led previous challenges to EPA's small refinery

---

[4] *See* Comments of Renewable Fuels Ass'n, EPA-HQ-OAR-2021-0566-0065 (Feb. 7, 2022); Comments of Growth Energy, EPA-HQ-OAR-2021-0566-0073 (Feb. 7, 2022); Comments of American Coalition for Ethanol, EPA-HQ-OAR-2021-0566-0035I (Feb. 7, 2022); Comments of National Farmers Union, EPA-HQ-OAR-2021-0566-0049 (Feb. 10, 2022); Comments of National Corn Growers Ass'n, EPA-HQ-OAR-2021-0566-0053 (Feb. 10, 2022).

exemption decisions and the underlying policies, including the Tenth Circuit case that precipitated the denials at issue here and a case in the D.C. Circuit challenging EPA's initial decision to grant the SRE petitions that are now the subject of the related April SRE Denial action. *Renewable Fuels Ass'n*, 948 F.3d 1206 (10th Cir. 2020); *supra* n. 4; *Sinclair Wyoming Refining Co. v. EPA*, No. 19-1196 (D.C. Cir. 2019). Similarly, Growth Energy has played an active role in publicly advocating for clarity and efficiency in the renewable fuels market by, among other things, expressing public support for the proposed Small Refinery Exemption Clarification Act, which would amend CAA section 211(*o*)(9) to limit refineries eligible to receive SREs to those refiners who have continuously received an SRE since 2011.[5]

### C. RFA's, Growth Energy's, ACE's, NFU's, and NCGA's Interests Would Not Be Adequately Represented by Another Party

To demonstrate inadequate representation, a movant's burden is "minimal." *Brumfield v. Dodd*, 749 F.3d 339, 345 (5th Cir. 2014). Consequently, a movant must show only that the existing representation "*may* be inadequate." *La Union del Pueblo Entero v. Abbott*¸ 29 F.4th 299, 308 (5th Cir. 2022); *see also Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972) ("The requirement of the Rule is satisfied if

---

[5] *See* Press Release, Growth Energy, Growth Energy Applauds New Legislation to Clarify Oil Refinery Exemption (Jul. 2, 2021), *available at* https://growthenergy.org/2021/07/02/growth-energy-applauds-new-legislation-to-clarify-oil-refinery-exemptions/. The Small Refinery Exemption Clarification Act is a proposed piece of legislation in the 117th Congress.

the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal.").

Courts often "look skeptically on government entities serving as adequate advocates for private parties." *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 321 (D.C. Cir. 2015). Although this Court has recognized a "presumption[] of adequate representation" in some situations "when the existing party is a governmental body or officer," *La Union del Pueblo Entero¸* 29 F.4th at 308 (quotation cleaned), that presumption does not apply here. It applies only where the existing governmental party is "charged by law with representing the interests of the intervenor." *Id.* (quotation cleaned). EPA, however, is not charged by the Clean Air Act with representing the renewable fuel industry's interests but rather with setting annual RFS standards and granting SREs where justified under the statute.

In any event, the presumption "can be overcome by showing that the intervenor's interest is in fact different from that of the governmental party and that the interest will not be represented by the existing governmental party." *La Union del Pueblo Entero¸* 29 F.4th at 308 (cleaned up). That is the case here, even though EPA and movants share the ultimate objective of sustained the April and June SRE Denial Decisions. *See Wal-Mart Stores, Inc. v. Tex. Alcohol Beverage Comm'n*, 834 F.3d 562, 569 (5th Cir. 2016) (state regulatory commission did not adequately represent private party even though the two parties had the "same ultimate objective"). EPA's

defense will reflect its institutional interests in its authority to administer the RFS program, whereas movants' interest is in protecting the RFS-based demand for renewable fuel. As shown by the many instances in which movants have been opposed to EPA's RFS actions—*see, e.g.*, *RFA*, 948 F.3d 1206; *Renewable Fuels Ass'n v. EPA*, Case No. 19-1220—there is ample opportunity for tension between EPA's and movants' interests and thus between their arguments. *See Crossroads*, 788 F.3d at 321 (stating agency did not adequately represent private party even though there was "general alignment" between their positions).

RFA, Growth Energy, ACE, NFU, and NCGA also can provide this Court with information concerning the renewable fuels industry that may assist the Court in understanding the issues in this litigation and assessing the practical implications of its decisions.

## CONCLUSION

For the foregoing reasons, RFA, Growth Energy, ACE, NFU, and NCGA respectfully request that the Court grant them leave to intervene in support of Respondent EPA.

Dated: February 17, 2023

Respectfully submitted,

/s/ *Shelby L. Dyl*

SETH P. WAXMAN
DAVID M. LEHN
MICHAEL MOORIN
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000
seth.waxman@wilmerhale.com
david.lehn@wilmerhale.com
michael.moorin@wilmerhale.com

*Counsel for Growth Energy*

MATTHEW W. MORRISON
SHELBY L. DYL
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036-3006
(202) 663-8036
matthew.morrison@pillsburylaw.com
shelby.dyl@pillsburylaw.com

*Counsel for Renewable Fuels Association,*
*Growth Energy, American Coalition for*
*Ethanol, National Farmers Union, and*
*National Corn Growers Association*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fifth Circuit Rules 26.1.1 and 28.2.1, Movants provide the following corporate disclosure statement:

The **Renewable Fuels Association** ("RFA") states that it is a non-profit trade association. Its members are ethanol producers and supporters of the ethanol industry. It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members. The Renewable Fuels Association does not have a parent company, and no publicly held company has a 10% or greater ownership interest in it.

The **American Coalition for Ethanol** ("ACE") is a non-profit trade association. Its members include ethanol and biofuel facilities, agricultural producers, ethanol industry investors, and supporters of the ethanol industry. ACE promotes the general commercial legislative, and other common interests of its members. ACE does not have a parent company, and no publicly held company has a 10% or greater ownership interest in it.

**Growth Energy** is a non-profit trade association. Its members are ethanol producers and supporters of the ethanol industry. It operates to promote the general commercial, legislative, and other common interests of its members. Growth Energy does not have a parent company, and no publicly held company has a 10% or greater ownership interest in it.

The **National Farmers Union** ("NFU") is a non-profit trade association. Its members include farmers who produce biofuel feedstocks and consume large

quantities of fuel. The NFU promotes the general commercial, legislative, and other common interests of its members. It does not have a parent company, and no publicly held company has a 10% or greater ownership interest in it.

The **National Corn Growers Association** ("NCGA") is a non-profit trade association. Its members are corn farmers and supporters of the agriculture and ethanol industries. NCGA promotes the general commercial, legislative, and other common interests of its members. NCGA does not have a parent company, and no publicly held company has a 10% or greater ownership interest in it.

Dated: February 17, 2023                 Respectfully submitted,

                                         /s/*Shelby L. Dyl*
                                         Shelby L. Dyl

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies:

1.    This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 3,268 words, excluding the exempted portions of the brief, as provided in Fed. R. App. P. 32(f). As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

2.    This motion complies with the typeface and type style requirements of Fed. R. App. P. 27(a)(5)-(6) because it was prepared in proportionally-spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: February 17, 2023            Respectfully submitted,

/s/*Shelby L. Dyl*
Shelby L. Dyl

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 17, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: February 17, 2023                    Respectfully submitted,

                                            /s/*Shelby L. Dyl*
                                            Shelby L. Dyl

## UNITED STATES COURT OF APPEALS FOR
## THE FIFTH CIRCUIT

| | | |
|---|---|---|
| CALUMET SHREVEPORT REFINING, L.L.C., ET AL.<br><br>Petitioner,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY,<br><br>Respondent. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 22-60266 and consolidated cases |

## I. <u>DECLARATION OF BRIAN JENNINGS</u>

1. My name is Brian Jennings. I am over 18 years of age and am competent to give this Declaration. This Declaration is based on personal knowledge.

2. American Coalition for Ethanol ("ACE") is a non-profit grassroots organization that advocates for the domestic ethanol industry. ACE's members include U.S. ethanol biorefineries, investors in biofuel facilities, farmers, and companies that supply goods and services to the U.S. ethanol industry. Among ACE's purposes is representing its members in lawsuits affecting the ethanol industry.

3. I have been employed with ACE since 2004. I am ACE's Chief Executive

Officer and previously served as Executive Vice President. I also have worked as an advisor to U.S. Senator Tim Johnson and for a South Dakota farm organization in support of farmers, ranchers, and renewable fuels. In recent years, I have overseen ACE's regulatory and legislative initiatives, litigation concerning the implementation of the Renewable Fuel Standard ("RFS"), and public and media relations activities. I am also a fourth generation South Dakotan who has helped raise cattle and crops on land that my family has homesteaded for the past century. Throughout my years working for ACE, I have developed an in-depth understanding of the business and operations of the members of ACE, and of the market for ethanol fuel in the United States.

4. Many of ACE's members produce a type of renewable fuel, ethanol, that can be used by obligated parties for compliance with these RFS obligations.

5. Other members grow crops, primarily corn, that are used in the production of renewable fuels.

6. The RFS mandates that refiners and importers of transportation fuel (collectively, "obligated parties") blend a specified volume of renewable fuel into transportation fuel (gasoline and diesel). The statute specifies renewable fuel volume requirements through 2022, but EPA can reduce

2

and has reduced these volumes if certain conditions are met and if EPA satisfies specified considerations.

7.  To comply with the mandates of the RFS, obligated parties can purchase gallons of ethanol to blend with gasoline at their refineries or terminals or purchase renewable identification numbers ("RINs"), which represent physical volumes of renewable fuel, from other parties who have blended renewable fuels with transportation fuel. RINs are attached to the ethanol that ACE's members produce and sell.

8.  Obligated parties can also "bank" any RINs they obtained for compliance with their volume obligations. These "Carryover RINs" are credits that are held in inventory by market participants that may be used to meet up to 20 percent of an obligated party's compliance requirements for the following year.

9.  Congress has allowed individual "small refineries" to petition the U.S. Environmental Protection Agency ("EPA") for an exemption from compliance with their Renewable Fuel Standard ("RFS") obligations for a given year "for reason of disproportionate economic hardship." 42 U.S.C. § 7545(o)(9)(B)(i).

10. On April 25, 2022, EPA denied 36 petitions for small refinery exemptions ("SREs") based on a revised approach to evaluating SRE petitions. On

4880-5356-3472.v1

June 3, 2022, EPA denied 69 petitions for compliance years 2016-2021 (the "June SRE Denial"). Petitioner, a small refinery whose SRE petition was denied, has challenged EPA's decision in this case.

11. ACE is moving to intervene in this case to support EPA's June SRE Denial, as this case could impact ACE and its members.

12. When EPA grants SREs, ACE's ethanol producers experience lower revenues resulting from a combination of reduced blending volumes and lower per-gallon prices. Similarly, it is my understanding that lower demand for ethanol reduces demand and prices for renewable fuel feedstocks grown by ACE's agricultural members.

13. If the petitioner's challenge was to succeed and EPA were to grant the exemptions, EPA would retroactively relieve those refineries from their RFS obligations, returning RINs to the refineries that would reflect their newly exempt volumes. These refineries would then be able to use their RINs to meet future compliance obligations in lieu of physical volumes of renewable fuel, thereby decreasing demand for renewable fuel and feedstocks.

14. Decreasing—or even flatlined—ethanol blending levels is only one component of the potential economic impact to ACE's ethanol producer members. The reduction in ethanol demand attributable to

4

SREs also creates a buyer's market that forces ethanol producers to lower prices in order to compete.

15. These lower prices squeeze margins for ethanol producers and put marginal plants at risk of idling or permanent closure.

16. Because of the foregoing points, ACE and its members will be harmed if the Court finds for the petitioner in this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge.

Executed this 17th day of February 2023.


Brian Jennings


5

## UNITED STATES COURT OF APPEALS FOR
## THE FIFTH CIRCUIT

| | |
|---|---|
| CALUMET SHREVEPORT REFINING, L.L.C., ET AL. )))))))))))))) | |
| Petitioner, | |
| v. | Case No. 22-60266 and consolidated cases |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, | |
| Respondent. | |

## <u>DECLARATION OF EMILY SKOR</u>

1. My name is Emily Skor. I am over 18 years of age and am competent to give this Declaration. This Declaration is based on personal knowledge. I am submitting this Declaration on behalf of the movants' motion to intervene in the above-captioned matter.

2. I serve as the CEO of Growth Energy. Growth Energy is a national trade association dedicated to promoting the commercial production and use of renewable fuels, particularly conventional and cellulosic ethanol. Growth Energy's 89 producer members make more than 7.5 billion gallons of ethanol that is used to meet the blending requirements of the Renewable Fuel Standard (RFS).

3.  The RFS was first enacted by the Energy Policy Act of 2005 and then further broadened by the Energy Independence and Security Act of 2007. The RFS program was established to blend more renewable fuels into our nation's transportation fuel system in order to reduce our dependence on foreign oil imports and to reduce greenhouse gas emissions. The statutory requirements called for 36 billion gallons of renewable fuel to be blended by 2022.

4.  In the market for transportation fuel, renewable fuel competes with fossil fuels. Any renewable fuel that is used for transportation purposes displaces the fossil fuel that would otherwise be used.

5.  The RFS annual volume requirements define the amount of renewable fuel that must be used in the nation's transportation fuel supply. Thus, the requirements define a guaranteed level of demand for renewable fuel.

6.  The volume requirements address four "nested" categories of renewable fuel: (1) cellulosic biofuel and (2) biomass-based diesel are types of (3) advanced biofuel, and all three of these are types of renewable fuel that can be credited toward (4) the total renewable fuel obligation.

7.  Once the required volumes are determined for a given year, EPA converts those volumes into volume obligations, which are expressed as a percentage of the total transportation fuel projected to be consumed in the year. Each

2

obligated party must ensure that the fuel it refines contains the required percentages of renewable fuel, sometimes called "RVOs."

8. An obligated party may meet its RVOs directly by blending renewable fuel with the fossil fuel it refines to make transportation fuel (and thereby displacing some amount of fossil fuel). Or an obligated party may meet its RVOs indirectly by buying credits, called RINs, from others—either those who themselves blended renewable fuel (thereby displacing fossil fuel) or those who acquired the RINs from yet another party who blended.

9. Ethanol is, by far, the most commonly used renewable fuel in the transportation-fuel market. Roughly three-quarters of the renewable fuel used to comply with the RFS annually is ethanol. And in the segment of the market where all types of renewable fuels compete among themselves—that is, once the advanced RFS standard is met—conventional ethanol accounts for roughly 95% of the renewable fuel that is used to comply with the RFS annually.

10. Conventional ethanol generates D6 RINs, and thus D6 RIN prices best reflect the overall level of demand for renewable fuel.

11. Growth Energy's membership includes producers of conventional and cellulosic ethanol.

12. Under certain limited circumstances, EPA has the statutory power to exempt

3

certain obligated parties – "small" refineries – from their RVOs. Because historically EPA has not required obligated parties to make up the exempt volumes (whether prospectively or retrospectively), the effect of small refinery exemptions has been to reduce the RFS volume requirements gallon-for-gallon. In other words, small refinery exemptions have reduced the demand for renewable fuel.

13. On April 25, 2022, EPA denied 36 petitions for small refinery exemptions ("SREs") based on a revised approach to evaluating SRE petitions (the "April 2022 Denial"). On June 3, 2020, EPA denied 69 petitions for compliance years 2016-2021 (the "June SRE Denial"). Petitioner – a small refineries whose SRE petitions was denied – has challenged EPA's decision in this case.

14. Growth Energy is moving to intervene to support EPA's June SRE Denial because the case could have significant negative implications for the association and its members. The significant adverse effect of the SREs on ethanol producers can be seen in various ways.

15. Reducing the amount of renewable fuel that refineries are required to blend into transportation fuel exposes renewable fuel producers to additional competition with fossil fuel producers to determine the composition of transportation fuel.

4853-4699-1952.v1

16. Additionally, SREs substantially reduce the demand for renewable fuel. If the SREs at issue was granted, EPA would retroactively relieve those refineries from their RFS compliance obligations by returning RINS reflecting the refineries' newly exempt volumes. The refineries could then use these RINs to meet their future compliance obligations in lieu of physical volumes of renewable fuel, which would lead to decreased demand for feedstocks and renewable fuel.

17. Because of the foregoing points, Growth Energy and its members will be harmed if the court finds for the petitioner in this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on my personal knowledge and information prepared by Growth Energy.

Executed this 17th day of February, 2023.

Emily Skor

4853-4699-1952.v1

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

| | |
|---|---|
| CALUMET SHREVEPORT REFINING, L.L.C., ET AL. <br><br><br> Petitioner, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY <br><br> Respondent. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> Case No. 22-60266 and consolidated cases |

## DECLARATION OF GEOFF COOPER

1. My name is Geoff Cooper. I am over 18 years of age and am competent to give this Declaration. This Declaration is based on personal knowledge, published data, and studies and information developed by the Renewable Fuels Association ("RFA"). I am submitting this Declaration on behalf of the movants' motion to intervene in the above-captioned matter.

2. Since 1981, RFA has served as a non-profit, national trade association and voice for the United States' ethanol industry both domestically and internationally. Ethanol is a renewable fuel produced from plant-based feedstocks, including grains like field corn and sorghum. The members of RFA include companies that manufacture ethanol fuel and market it to

blenders and marketers of gasoline, as well as companies that provide goods and services (such as process technologies and raw feedstocks) to ethanol producers. RFA's members operate facilities across the United States, from California to New York, and are responsible for a substantial share of the nation's ethanol production. Among RFA's purposes is representing its members in lawsuits affecting the ethanol industry.

3. I am currently the President and CEO of RFA and have served in that capacity since 2018. I have been employed with RFA since 2008, when I was hired as the organization's director of research and analysis. I have served in various capacities throughout my tenure, most recently as Executive Vice President. Prior to serving as CEO, I led RFA's regulatory activities, oversaw the group's research and technical initiatives, supported public and media relations efforts, assisted with legislative initiatives and managed the Renewable Fuels Foundation. Prior to RFA, I worked on ethanol issues for the National Corn Growers Association and served as a captain in the U.S. Army, where I specialized in bulk petroleum product logistics. Throughout my 14 years working for RFA and years of prior work experience, I have developed an in-depth understanding of the business and operations of the members of RFA, and the market for ethanol fuel in the United States.

4888-2033-4672.v1

4. Operators of domestic petroleum refineries are obligated to comply with the Renewable Fuel Standard ("RFS"), which mandates that transportation fuel sold or introduced into commerce domestically contains, on an average annual basis, specified volumes of renewable fuel and three subcategories of renewable fuel: cellulosic biofuel, advanced biofuel, and biomass-based diesel.

5. The statute establishes annual volumes for each subcategory, though EPA adjusts these volumes if specific statutory criteria are satisfied. EPA uses these annual volumes and estimates of transportation fuel consumption (gasoline and diesel) to calculate the annual percentage of total transportation fuel that must be comprised of each type of renewable fuel. *See* 40 C.F.R. § 80.1405.

6. Obligated parties under the RFS then apply those annual percentages to their own annual production or import volume of gasoline and diesel to determine the number of gallons of each type of renewable fuel for which they are responsible each year (their renewable volume obligation, or "RVO").

7. Obligated parties demonstrate compliance with their renewable volume obligations by accumulating quantities of renewable identification numbers ("RINs"), which represent physical gallons of renewable fuel, either by blending renewable fuel into transportation fuels themselves and

3

"separating" RINs, or by purchasing RINs from other parties who have blended renewable fuel.

8. Obligated parties can obtain RINs at any time during the compliance period. They may "bank" any RINs they obtained for compliance with their volume obligations. Any RIN credits that aren't used to meet an obligated party's current year RFS obligation may be "carried over" and held in inventory. The "carryover RINs" may be used to meet up to 20 percent of an obligated party's compliance requirements for the following year.

9. RFA's members primarily produce a type of renewable fuel, ethanol, that can be used by obligated parties to meet their RFS renewable fuel obligations. Some RFA members also produce small volumes of biomass-based diesel, renewable diesel, or cellulosic ethanol—which can be used by obligated parties to meet the biomass-based diesel, advanced biofuel and cellulosic biofuel portions of the RFS.

10. Congress has allowed individual "small refineries" to petition the U.S. Environmental Protection Agency ("EPA") for an exemption from compliance with their RFS obligations for a given year "for reason of disproportionate economic hardship." 42 U.S.C. § 7545(o)(9)(B)(i).

11. On April 25, 2022, EPA denied 36 petitions for small refinery exemptions ("SREs") for compliance year 2018 (the "April SRE Denial") based on a

4888-2033-4672.v1

revised approach to evaluating SRE petitions. On June 3, 2022, EPA denied

69 petitions for compliance years 2016-2021 (the "June SRE Denial").

Petitioner—a small refinery whose SRE petition was denied as part of the

June SRE Denial—has challenged EPA's decision in the case at issue.

Because this case could have significant ramifications for RFA and its

members, RFA is moving to intervene to support EPA's decision.

12. If petitioner's challenge was to succeed and EPA were to grant the SREs at

issue, EPA would retroactively relieve those refineries from their RFS

compliance obligations by returning to the refineries RINs reflecting their

newly exempt volumes. The refineries could then use these RINs to meet

their future compliance obligations in lieu of physical volumes of renewable

fuel, which in turn would cause a decrease in demand for the renewable fuel

and feedstocks that RFA's members produce.

13. In addition, the influx of RINs returned to these refineries would cause a

decline in RIN prices due to increased supply. Lower RIN prices weaken the

incentive to blend renewable fuel. This is because obligated parties may

easily comply with their RFS obligations by purchasing low-cost surplus

RINs instead of blending physical volumes of renewable fuel.

14. It is my understanding that SREs granted (and, in turn, RINs returned) to

refiners in the past led to reduced ethanol blending volumes and lower per-

4888-2033-4672.v1

gallon prices for ethanol, both of which caused lower revenues for RFA's ethanol producer members.

15. In addition, when D6 RIN[1] prices fall below the level necessary to incentivize E15 and E85 consumption, then small refinery exemptions can erode demand for this segment of physical ethanol consumption, which otherwise offers the industry's best opportunity for demand growth.[2]

16. SREs also increase the number of carryover RINs, which means that if EPA's decision were to be reversed and the exemptions granted, RFA's members would continue to be harmed as obligated parties used carryover RINs to satisfy their renewable volume obligations for future compliance years. Even if exempt small refineries do not use these RINs for their own compliance and instead sell the RINs to other obligated parties, RFA and its members are harmed when other obligated parties use the carryover RINs for compliance instead of blending newly produced volumes of renewable fuel or obtaining RINs representing additional blending from other parties.

---

[1] D6 RINs are the credits associated with blending corn-based ethanol into gasoline.

[2] *See* Gabriel E. Lade, Sébastien Pouliot, and Bruce A. Babcock, *E15 and E85 Demand Under RIN Price Caps and an RVP Waiver*, Iowa State University 4 (March 2018), https://www.card.iastate.edu/products/publications/pdf/18pb21.pdf.

4888-2033-4672.v1

17. Because of the foregoing points, RFA and its members will be harmed if the Court finds for the petitioner in this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on my personal knowledge and information prepared by RFA.

Executed this 17th day of February, 2023.

Geoff Cooper

4888-2033-4672.v1

## UNITED STATES COURT OF APPEALS FOR
## THE FIFTH CIRCUIT

|  |  |  |
|---|---|---|
| CALUMET SHREVEPORT REFINING, L.L.C., ET AL. | ) ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Case No. 22-60266 and consolidated cases |
| U.S. ENVIRONMENTAL PROTECTION AGENCY | ) ) ) | |
| Respondent. | ) ) ) | |

## <u>DECLARATION OF ROB LAREW</u>

1. My name is Rob Larew. I am over 18 years of age and am competent to give this Declaration. This Declaration is based on personal knowledge. I am submitting this Declaration on behalf of the movants' motion to intervene in the above-captioned matter.

2. I serve as president of the National Farmers Union ("NFU"). NFU represents roughly 200,000 family farmers, ranchers, and rural members. Since 1902, NFU has worked to improve the well-being and quality of life of family farmers, ranchers, and rural communities by advocating for grassroots-driven policy adopted annually by our membership. Among NFU's purposes is representing its members in lawsuits affecting farmers

4867-3707-6304.v1

and rural communities.

3. I have served as President of NFU since March 2020. Prior to leading NFU, I served as NFU's Senior Vice President of Public Policy and Communications since fall 2016. Prior to joining NFU, I served over 22 years in Congress and the U.S. Department of Agriculture working on agriculture policy and communication. I graduated from Virginia Polytechnical Institute and State University with a Bachelor of Science in Dairy Science and completed graduate work in Agronomy at Pennsylvania State University. Throughout my entire career I have been working in the agricultural sector and developed an in-depth understanding of the business and operations of the members of NFU, as well as the market for agricultural products.

4. NFU's members include family farmers and growers of crops such as corn and soybeans, which can be used as feedstocks in renewable fuel production.

5. Corn is used to produce most of the non-advanced portion of renewable fuels (conventionional renewable fuel), and soybeans are used to produce biomass-based diesel. These are both types of renewable fuel required under the Renewable Fuels Standard ("RFS").

6. According to U.S. Department of Agriculture conversion factors, one bushel of corn yields approximately 2.7 gallons of ethanol, a renewable fuel.[1] A bushel of soybeans yields approximately 1.5 gallons of biodiesel.[2]

7. The RFS annual volume requirements define the amount of renewable fuel that must be used in the nation's transportation fuel supply. Thus, the requirements define a guaranteed level of demand for renewable fuel.

8. Under certain limited circumstances, EPA has the statutory power to exempt certain parties covered by the RFS – "small" refineries – from their RFS obligations. Because historically EPA has not required obligated parties to make up the exempt volumes (whether prospectively or retrospectively), the effect of small refinery exemptions has been to reduce the RFS volume requirements gallon-for-gallon. In other words, small refinery exemptions have reduced the demand for renewable fuel.

9. On April 25, 2022, EPA denied 36 petitions for small refinery exemptions ("SREs") based on a revised approach to evaluating SRE petitions. On June 3, 2020, EPA denied 69 petitions for compliance years 2016-2021 (the "June SRE Denial"). Petitioner, a small refinery whose

---

[1] U.S. Dep't of Agriculture, Documentation-Conversion Factors, https://www.ers.usda.gov/data-products/us-bioenergy-statistics/documentation/ (accessed Oct. 31, 2018).

[2] University of Arkansas, Division of Agriculture, Biodiesel, FSA1050-PD-3-2017RV, https://www.uaex.edu/publications/PDF/FSA-1050.pdf.

SRE petition was denied, has challenged EPA's decision in this case.

10. NFU is moving to intervene to support EPA's decision because this case could negatively impact NFU and its members.

11. If Petitioner's challenge was to succeed and EPA were to grant the exemptions, those refineries would no longer need to demonstrate compliance with the applicable volumes through those years, which would reduce demand for renewable fuel.

12. Based on my experience since the enactment of the RFS, reducing demand for total renewable fuel would erode demand for agricultural crops including corn and soybeans (just as increasing demand for renewable fuels through the RFS has increased demand for feedstock crops and helped farmers).

13. It is my understanding that reduced demand pushes the price for renewable fuel lower. Based on my experience, lower prices for their products mean that renewable fuel producers will pay less for feedstocks, including corn and soybeans.

14. Because of the foregoing points, NFU and its members will be harmed if the court finds for the petitioner in this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on my

5

personal knowledge and information prepared by NFU.

Executed this 17th day of February, 2023.


Rob Larew